**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                                                    :    Chapter 11
                                                                              :
The Northwest Company, LLC, *et al.*,              :    Case No. 20-10990 (MEW)
                                                                              :
                              Debtors.                            :    (Jointly Administered)
------------------------------------------------------------x

**BENCH DECISION GRANTING MOTION**
**TO CONVERT CASES TO CHAPTER 7**

A P P E A R A N C E S:

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
New York, NY
*Attorneys for Ashford Textiles, LLC*
   By:  Tracy L. Klestadt

SILLS CUMMIS & GROSS P.C.
New York, NY
*Attorneys for the Debtors*
   By:  S. Jason Teele
         Gregory A. Kopacz

LOWENSTEIN SANDLER LLP
New York, NY
*Attorneys for the Official Committee of Unsecured Creditors*
   By:  Jeffrey Cohen
         Michael Kaplan
         Lindsay H. Sklar

DUFFY AMEDEO LLP
New York, NY
*Attorneys for Ross Auerbach*
   By:  Todd E. Duffy
         Douglas A. Amedeo

**HON. MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

   This is the final version of a bench decision that I announced in open court on November 17, 2020. This final version has been edited to correct errors in transcription and inadvertent errors and omissions that I made in the course of my dictation.

I have before me a motion by Ashford Textiles LLC ("Ashford") to convert these cases to liquidation cases under chapter 7 of the Bankruptcy Code. The motion is governed by Section 1112(b) of the Bankruptcy Code, which provides that the Court "shall" convert a chapter 11 case to a chapter 7 case or shall dismiss the case (whichever is in the best interests of creditors and the estate) for "cause," unless the Court determines that the appointment of a chapter 11 Trustee or an examiner would be in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). "Cause" for a conversion includes, but is not limited to, the items listed in Section 1112(b)(4) of the Bankruptcy Code. Those listed items include two matters that are potentially relevant here. First, Section 1112(b)(4)(A) states that cause exists if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See* 11 U.S.C. § 1112(b)(4)(A). Second, section 1112(b)(4)(B) states that "cause" exists if there has been a "gross mismanagement of the estate." *See* 11 U.S.C. § 1112(b)(4)(B).

Section 1112(b)(2)(A) of the Bankruptcy Code sets forth an exception to the requirement of conversion or dismissal. The exception applies if the Court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate and if, in addition: (a) there is a reasonable likelihood that a plan will be confirmed within a reasonable time, (b) the underlying "cause" for dismissal or conversion consists of something other than the continuing loss or diminution of the estate without a reasonable likelihood of rehabilitation, and (c) there is a reasonable justification for the conduct that constituted "cause" for conversion and the problematic act or omission will be cured in a reasonable time. *See* 11 U.S.C. § 1112(b)(2).

In this particular case, the Debtors have sold all of their operating assets. There is nothing left to accomplish but to liquidate the assets that the estates still own (which consist of

2

accounts receivable and litigation claims) and to determine the allowed amounts of creditors' claims. The estates have no operating business to be resuscitated and liquidation is the only remaining option. The questions, then, are whether there is "cause" to say that liquidation should proceed under chapter 7 rather than through a potential chapter 11 plan, and (depending on the alleged "cause" for conversion) whether there are circumstances that weigh against conversion as contemplated by section 1112(b)(2).

Ashford argues that there is cause for conversion on two grounds. First Ashford contends that the Debtors and the Official Committee of Unsecured Creditors (the "Committee") have failed to protect the interests of the estates and creditors, have engaged in "questionable alliances" and behaviors, have pursued a "flawed" sale process, and have failed to pursue claims against the Debtors' principal, Mr. Auerbach. Ashford primarily argues that the sale process was tilted against Ashford itself, though it stops short of contending that it has evidence sufficient to prove those allegations today. Instead Ashford contends that a chapter 7 trustee should be appointed to conduct an unbiased investigation to determine whether any wrongdoing occurred.

Ashford also contends that there is evidence that Mr. Auerbach, the Debtors' principal, committed wrongdoing prior to the filing of these cases, and has expressed its worry that the Debtors and the Committee will not pursue such claims with sufficient fervor. But the Committee contends that it intends to pursue any claims against Mr. Auerbach that might exist and that it would like to assign such claims to a litigation trustee pursuant to a plan of reorganization.

Ashford acknowledged this morning that, on all of these points, it does not really have evidence in its possession that would be sufficient to show actual wrongdoing. Nor has Ashford argued that it is in a position to prove that there has been a gross mismanagement of the estates.

3

In fact, Ashford's papers do not use those words and do not cite to section 1112(b)(4)(B). In any event, to the extent that Ashford arguably seeks to invoke section 1112(b)(4)(B), it is plain to me that Ashford's suspicions of wrongdoing, and its desire for an independent investigation, and its vague expressions of doubt as to whether claims against Mr. Auerbach would be pursued with sufficient zeal, all fall short of carrying the burden of showing a "gross mismanagement" of the estates. There has obviously been intense friction throughout these cases between Ashford (on the one hand) and the Debtors on the other hand, but friction and sour grapes are not themselves cause for conversion. The possibility of a conversion based on gross mismanagement contemplates the presentation of actual proof of gross mismanagement, not merely a statement of suspicions or of a desire for further investigation.

Perhaps Ashford intends here to invoke my more general authority to find "cause" for conversion under circumstances that are not enumerated in section 1112(b). I do not find, however, that Ashford's suspicions or its desires for investigation would themselves warrant conversion. I have previously expressed my questions about certain things that happened during the sale process. Ashford has resources and if it thinks that wrongdoing occurred in the sale process, it could investigate that wrongdoing on its own, and at its own expense. I am sure that Ashford would prefer that a chapter 7 trustee do so at the expenses of the estates, but I do not find that to be a good reason for conversion. Ashford also seems wary of the Committee and its counsel and whether they would pursue litigation claims with sufficient zeal, but that strikes me just as a sign of animosity and distrust with little real evidence to back it up.

I do not mean to exonerate anyone, or to condone any particular actions or behavior by making these comments. I simply note that what is before me is nothing more than a suspicion of wrongdoing and a request for investigation, rather than a showing that any wrongdoing

4

actually occurred. In the absence of such a showing, I do not believe that cause for a conversion has been established based on alleged misbehavior by the Debtors and/or the Committee.

Of greater concern to me here is the second asserted ground for conversion, which is the contention that liquidation is inevitable and that the continued pursuit of a chapter 11 plan would just run up further expense while serving no legitimate purpose. I will treat this contention as an effort to invoke Section 1112(b)(4)(A) of the Bankruptcy Code, which states that "cause" for conversion exists if there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

One question raised by Section 1112(b)(4)(A) is whether we are faced with a substantial or continuing loss to or diminution of the estate. There is no longer any operating business here. The Debtors have ceased operations. The estates may need to liquidate certain assets and to convert them into cash, but the process of doing so involves only expense, not the creation of new assets. As the Court held in *Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004), in the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cashflow -- including ongoing administrative expenses may be enough to show a substantial or continuing loss or diminution of the estate.

In response, the Debtors and the Committee acknowledge that the continuation of the chapter 11 proceedings will involve additional expense, but they contend that a chapter 7 conversion would be even more expensive. They argue that the continuation of the chapter 11 cases therefore would conserve resources and result in less diminution of the estates than would occur in the event of a conversion to chapter 7. I will address those contentions in a moment.

The other question raised by Section 1112(b)(4)(A) is whether there is a reasonable likelihood of rehabilitation. It is permissible in chapter 11 to confirm a plan of reorganization

that contemplates a liquidation. The word used in Section 1112(b)(4)(A), however, is not "reorganization" but "rehabilitation." The word "rehabilitation", as used in Section 1112(b)(4)(A), does not include a liquidation. Instead, the word "rehabilitation" means the ability to re-establish a viable operating business. *See Loop Corp. v. United States Trustee*, 379 F.3d at 516 ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business"). Courts in this district have consistently agreed with this interpretation of the word "rehabilitation" as used in section 1112(b)(4)(A). *See*, *e.g.*, *In re Sillerman,* 605 B.R. 631, 656 (Bankr. S.D.N.Y. 2019); *In re East 81st LLC*, 13-13685 (SMB) 2014 Bankr. Lexis 1024 at *19 (Bankr. S.D.N.Y. Mar. 17, 2014); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010); *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)).

Even if rehabilitation were to mean something else (for example, just the ability to confirm a plan), that would still leave open the question of whether there is a reasonable likelihood that a plan may be confirmed in these cases. I note in this regard that at a prior hearing, and also in their initial written response to Ashford's motion, the Debtors agreed that, in light of Ashford's opposition, the confirmation of a plan would effectively be impossible, and therefore that there was cause for conversion of these cases to chapter 7. The Committee similarly stated in its written submission that it would not oppose the conversion of the cases, though only on certain conditions that included the allowance of professional fees and other claims. *See* Committee Objection (ECF #368 at 17-18 ¶54).

At the hearing on November 10, however, the Debtors and the Committee withdrew those prior concessions. They took the position instead that a plan might still be proposed and confirmed even over Ashford's objections. They also argued that the pursuit of a plan would be

6

less expensive and would best serve the interests of creditors generally and of the estates. They have argued that converting the case is not in the best interests of creditors, and that there is a reasonable likelihood that a plan will be confirmed within a reasonable time.

I instructed the parties on November 10 to have further discussions among themselves as to whether they could agree on the terms of a path forward that might include an agreement on the identity of a liquidating trustee in the event of a chapter 11 plan, and perhaps an agreed scope as to what, if any, inquiries the liquidating trustee or a chapter 7 trustee might conduct. The parties have not been able to reach such an agreement. I did not invite the parties to tell me the details of their settlement discussions, but for some reason, they have elected to do so. I have no intention of commenting upon the parties' settlement positions, except to note that it is quite clear to me that the main reason for a dispute here is that each side wants to control what might happen going forward. Ashford wants the case to be put in the hands of someone who hopefully will investigate the Debtors, the Committee and their professionals. The Debtors and the Committee want to pursue a course that will offer them and their professionals potentially greater protections. Frankly, the differences do not reflect matters of real principle from the point of view of other parties in interest; they simply reflect the same friction and animosity that has characterized too many of the events in these cases.

As noted above, the Debtors and the Committee have contended that the confirmation of a chapter 11 plan would actually be less expensive than a chapter 7 liquidation, in part because a chapter 7 trustee would be entitled to a commission, and in part because a chapter 11 litigation trustee allegedly could and would pursue litigation claims more efficiently than a chapter 7 trustee (possibly because the parties contemplate that the Committee's counsel would be retained by a litigation trustee). These arguments are not convincing.

On November 17, I questioned counsel about the assets that the estates likely would be able to distribute once claims are liquidated. Even if I were to assume litigation successes and collections and to assume distributions of $15 million, a chapter 7 trustee's commission would be $473,250. If on the other hand a plan process is pursued, then several sets of professionals for the Debtors and the Committee will continue to run up fees and expenses in the preparation and potential confirmation of a plan of reorganization and in establishing the various matters that must be proved in order to obtain such confirmation. None of that would be necessary in chapter 7. It is also clear that Ashford will fight confirmation and that the battle over confirmation would just produce added expense. That, too, would not occur in the event of a chapter 7 conversion.

A trustee might be entitled to a commission in chapter 7, but a chapter 7 trustee effectively would replace both the Debtors and the Committee, thereby substantially reducing the numbers of attorneys who are billing time to these matters. The monthly accruals of professional fees for the Debtors and the Committee, including the Debtors' attorneys, the Clear Thinking Group and the Committee's attorneys, have exceeded $500,000 in every month in these cases. I noted during my questioning of counsel on November 17 that it seems likely to me that the professional fee expense of pursuing a chapter 11 plan would exceed the potential chapter 7 trustee commissions. Counsel to the Committee stopped short of admitting that this would necessarily be true, but counsel admitted that my proposed conclusion was a reasonable one.

As to the alleged expenses of pursuing litigation claims: the premise of the Committee's argument is that a litigation trustee appointed under a chapter 11 plan would be more likely to choose counsel who has already investigated the claims than a chapter 7 trustee would be. But frankly, I do not see why a chapter 7 trustee would be under any different limitations than a

8

litigation trustee in the selection and in the employment of counsel to pursue claims, or why a chapter 7 trustee could not use the same counsel as a litigation trustee might choose to use. I see no reason to assume that a chapter 7 trustee would make decisions about the pursuit of litigation claims that would be any less efficient or cost-effective than a litigation trustee would make.

I therefore conclude that the expense of pursuing a chapter 11 plan actually would be greater than the expense of a chapter 7 proceeding.

As to whether there is a reasonable likelihood of rehabilitation: certainly rehabilitation will not occur in the sense that there will not be a restoration of a viable operating business. These companies are in liquidation. I also do not believe there is a reasonable likelihood of confirming a chapter 11 plan.

The Debtors' secured creditor has been paid in full. There are enough assets to pay all priority and administrative claims. The only creditors left are general unsecured creditors. Ashford's claim is by far the largest of the filed general unsecured creditor claims. Ashford claims it is owed $43 million, and the Committee believes that amount could be as low as $23 million. There are about $27 million of general unsecured creditor claims held by persons other than Ashford. If all general unsecured creditors vote as one class, a negative vote by Ashford would ensure that the general unsecured creditors do not accept the plan. A plan cannot be confirmed unless there is at least one accepting impaired class of creditor claims. *See*, 11 U.S.C. § 1129(a)(10). In this case, general unsecured creditors are the only impaired class of creditors. There are no other impaired classes.

The Committee's counsel suggested two possible ways around this at the hearing on November 17. One would involve a potential effort to disqualify Ashford's vote as having been cast in bad faith. But as my questioning at the hearing made clear, at least one of the things that

9

the parties hope to do in a proposed plan of reorganization is to exculpate the parties and their counsel for any actions taken during the course of the chapter 11 proceedings. Ashford has said it believes that wrongdoing occurred, and if Ashford were to vote against a plan that included such a provision, the parties acknowledged that such a vote would not be in bad faith.

The other possibility raised on November 17 was that Ashford might be classified as an insider based on alleged but unproven connections between Ashford and another party (Extreme Horse) who is a minority owner of Northwest. But I note in this regard that the parties previously presented me with an agreed form of order approving the sale of the Debtors' assets to Ashford, which included an explicit finding that Ashford was not an "insider" as that term is defined in the Bankruptcy Code.

A different alternative might be that the Debtors and the Committee could try some kind of gerrymandering under which Ashford's claims would be put in a class that is separate from other general unsecured creditor claims, so as to try to create a separate accepting impaired class made up of other creditors. But nobody has suggested that this could be done, and an effort to do so would certainly be highly questionable, at a minimum, under the prevailing authorities. *See*, *e.g.*, *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship*, 21 F.3d 477, 482 (2nd Cir. 1994) (noting that "[a]ll the circuit courts that have heretofore visited the question of when similar claims may be classified separately have held that similar claims may not be separately classified solely to engineer an assenting impaired class"); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that it is impermissible to classify creditors separately in order to engineer an accepting class, and that separate classification can only be done if there are reasons

"independent of the Debtors' motivation to secure the vote of an impaired, assenting class of claims").

I note, too, that all of these options just create the prospect of a continuing expense, with very little chance of success.

The Collier's treatise includes an interesting paragraph in its discussion of conversion under 1112(b). It states:

> In evaluating the purposes of chapter 11 as they relate to section 1112(b), it is also important to bear in mind that Congress designed the reorganization process to provide a forum for the negotiated resolution of the debtor's case in a manner that is as accommodating as possible. On the other hand, not every case is capable of bearing the weight of this ideal. In reality, while the chapter 11 forum provides a medium for negotiation and an opportunity to better accommodate the interest of a broad range of constituents by potentially preserving the value of the debtor as a going concern, the Code does not guarantee this result or even require its pursuit beyond the point at which the costs are not justified, or the intended benefits of the process are unlikely to be obtained.

*See* 7 COLLIER ON BANKRUPTCY, ¶ 1112.04(5)(b) (footnotes omitted).

Most of the creditors of these estates have no interest or stake in the animosity that so plainly exists between Ashford (on the one hand) and the Debtors, the Committee and their professionals on the other hand. Ashford believes that the Debtors and the Committee have acted inappropriately, and the Debtors and the Committee have made their own accusations against Ashford. I take no position today as to whether there are matters that should be investigated further or as to what such an investigation should or should not entail. If one thing is clear, however, it is that the Debtors, the Committee and Ashford all have too many vested or predetermined interests and grievances to leave them in charge of whether such an investigation is done, and if so, what is investigated, and how much of the estates' resources will be devoted to that task. If there are matters that should be investigated, in the interests of the estates and creditors, then an independent party should have the right to do so, free of the control of persons

11

whose conduct is possibly to be investigated, and with the freedom also to decide when further inquiry may be unwarranted and unlikely to produce gains that would be worth the costs.

Ashford has indicated that it will irrevocably waive the right to ask for the election of a chapter 7 trustee, and has further agreed that, if there is such an election at the request of someone else, then Ashford will waive the right to vote for any trustee other than the trustee appointed by the United States Trustee.  This proposal was made as a way of offering assurance that Ashford will not try to use a chapter 7 conversion to hand-pick a trustee who will use estate asset to further Ashford's desires.

I will hold Ashford to this commitment, and I find that with this commitment and in light of the other matters I have stated, the conversion to chapter 7 is in the best interest of the estates and their creditors.  Cause for conversion exists because the continuation of the chapter 11 cases offers nothing but the prospect of unnecessary proceedings and expense without a sufficiently likely prospect of rehabilitation or of confirmation of a plan of reorganization.  The continued expense associated with the personal animosities in these cases must come to end, and so we will enter a conversion order.

Dated: New York, New York
       November 20, 2020

/s/ **Michael E. Wiles**
HON. MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE